UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JOSHUA N. HIXSON, ET AL, )
O/B/O DENNIS HIXSON, Deceased )
)
V. ) NO. 2:10-CV-152
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation regarding the partial administrative denial of the plaintiffs' decedent's applications for disability insurance benefits and supplemental security income under the Social Secuirty Act . Both the plaintiffs and the defendant Commissioner have filed dispositive Motions [Docs. 9 and 11].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiffs are the sons and survivors of Dennis Hixson. Mr. Hixson was found to have been disabled from February 21, 2002 through September 30, 2003, and was "entitled to a period of disability and disability insurance benefits and is eligible for supplemental security income," in a hearing decision rendered by the Administrative Law Judge ["ALJ"] on February 4, 2005 (Tr. 57). In that same decision, the ALJ found that "beginning October 1, 2003, the claimant's impairments improved to the point that he was not under a 'disability,'" as defined by the regulations (Tr. 57-58). On December 11, 2006, the case was remanded by the Appeals Council for further analysis by the ALJ (Tr. 883-85). Dennis Hixson, unfortunately, passed away on February 9, 2007, before any further development of the claim could take place.

Plaintiffs' decedent was a younger individual at the time he filed his applications. He had a high school education and past relevant work experience as a care giver, which was semi-skilled and required medium exertion, and as an assembly line worker, which was unskilled and required medium exertion. He alleged that his disability onset date was February 21, 2002. Plaintiff alleged that he was disabled due to pain hin his back, hips, legs and wrist, as well as depression, panic attacks and poor memory.

Mr. Hixson's medical history is summarized in the Commissioner's brief as follows:

2

Mr. Hixson began visiting Gordon Hoppe, M.D., in 1997, complaining about lower back and leg pain, anxiety, and gastritis (Tr. 293–96). A 1998 MRI showed a ruptured disc in Mr. Hixson's back (Tr. 678), and he subsequently underwent two back surgeries (Tr. 281, 681–82). Thereafter, Mr. Hixson received treatment and medication for his back and leg pain from Richard Aasheim, M.D., and other doctors at the VA Medical Center (Tr. 273–77, 300–321).

Mr. Hixson was in a car accident in February 2002 and suffered injuries to his right hip, left forearm, and wrist (Tr. 273, 366). After hip surgery by Dr. Tom Huddleston (Tr. 368–73), Mr. Hixson was admitted to a rehabilitation hospital for two weeks (Tr. 373–83). He was evaluated by a psychiatrist, Dr. Eric Roth, who noted that Mr. Hixson had no problems with concentration or attention (Tr. 382). Dr. Roth questioned Mr. Hixson extensively regarding his suspicion that Mr. Hixson misused prescription medications (Tr. 381). He diagnosed Mr. Hixson with multiple trauma, panic disorder, and adjustment disorder with elements of depression and anxiety (Tr. 382). Upon discharge, Mr. Hixson was able to ambulate with a walker (Tr. 374).

After discharge, Mr. Hixson attended physical therapy (Tr. 273). In April 2002, Drs. Huddleston and Aasheim advised Mr. Hixson not to work for fourteen months (Tr. 425, 426). Dr. Huddleston reported that Mr. Hixson's hip and wrist recovered successfully (Tr. 423–24), and Mr. Hixson was prescribed pain medication (Tr. 268–271). Dr. Huddleston commented in June 2002 that Mr. Hixson was seen in the emergency room asking for pain medication the same day he saw Dr. Huddleston; the doctor noted "[h]opefully this drug seeking behavior will not continue" (Tr. 424, 474–75).

Mr. Hixson continued to visit Dr. Aasheim and other doctors throughout 2002 and 2003, complaining of back and leg pain and seeking medication (Tr. 255–60, 262–74, 322–58, 427–56, 512–32, 656–61, 663, 708–19, 726–42, 871–80). His doctors advised him numerous times against unnecessarily seeking out medication (Tr. 344, 345, 728, 872, 873). After undergoing lumbar disk surgery in February 2003, Mr. Hixson reported that his left leg did not hurt as much (Tr. 263). Dr. Aasheim opined in May 2003 that Mr. Hixson was totally disabled due to back and right leg impairments and difficulty with memory and concentration (Tr. 261).

Mr. Hixson sought treatment from a mental health clinic in June 2003 for anxiety and depression (Tr. 501–10). Several months later, Mr. Hixson reported nightmares and anxiety in crowds, but slept "somewhat better" due to his medication (Tr. 494–96). In September 2003, Mr. Hixson's treating therapist, Wylene Jacobs, noted that Mr. Hixson was "calmer" than in previous sessions (Tr. 492). She observed that Mr. Hixson went swimming three to four times a week (*id.*). The ALJ found that Mr. Hixson's disability ended in September 2003 (Tr. 17, 57–58).

In October 2003, David McConnell, M.D., performed a physical examination (Tr. 556–61). Mr. Hixson told Dr. McConnell that his mental impairments were more serious than his physical ailments (Tr. 556), and that he was not under the care of an orthopedic surgeon because "[t]hey've done all they can do" (Tr. 557). Dr.

3

McConnell observed that Mr. Hixson was able to ambulate without assistance, though he used a cane (Tr. 558). Mr. Hixson exhibited full range of motion in his ankles, left knee, left hip, thoracic spine, elbows, wrists and shoulders and had partial range of motion in his right lower extremity and lumbosacral spine (Tr. 559). Dr. McConnell saw no evidence of sensory or motor deficit in the lower extremities (*id.*). An x-ray showed his repaired hip in good position and alignment (*id.*). Dr. McConnell opined that Mr. Hixson could lift or carry 25 pounds occasionally and 20 pounds frequently, and sit, stand, or walk with normal breaks for six hours in an eight-hour workday (Tr. 560).

Dr. Rexford Burnette, a psychologist, performed a consultative evaluation in October 2003 (Tr. 551–55). He performed a thorough clinical evaluation, and in his findings, Dr. Burnette noted that Mr. Hixson exhibited adequate intelligence, an appropriate ability to relate interpersonally, and no abnormal behavior suggestive of severe affective distress (Tr. 553–54). Mr. Hixson said he regularly performed household chores, such as washing dishes and mopping the floor, and shopped without notable difficulty (Tr. 554). Dr. Burnette diagnosed Mr. Hixson with anxiety disorder not otherwise specified and found that he was moderately-to-markedly limited in his reading abilities and only mildly limited in his ability to tolerate and adapt to daily stressors and understand and remember (*id.*). He further found that Mr. Hixson had no significant limitations with sustained concentration, persistence, or social interaction (*id.*).

In October 2003 and February 2004, two agency reviewing physicians completed mental capacity assessments (Tr. 562–79, 588–605). They found that Mr. Hixson could understand, remember, concentrate, and execute detailed instructions on a sustained basis, relate appropriately with superficial public contact, and adjust to changes in the work setting, all with little difficulty (Tr. 564, 588, 590). One doctor determined that Mr. Hixson had reading and anxiety disorders (Tr. 570–72), but did not have a cognitive disorder (Tr. 578). Both found that Mr. Hixson did not have marked limitations evidenced by the record (Tr. 578–79, 588–90).

Two other agency reviewing doctors completed physical capacity assessments in November 2003 and February 2004 (Tr. 580–87, 606–11). One doctor opined that Mr. Hixson could occasionally lift or carry up to 20 pounds, frequently lift or carry up to ten pounds, and push or pull without limitations (Tr. 581), while the other doctor found that Mr. Hixson could occasionally lift or carry up to 50 pounds, frequently lift or carry up to 25 pounds, and push or pull with limitations in the lower extremities (Tr. 607). Both doctors found that Mr. Hixson could sit, stand or walk for six hours in an eight-hour day (Tr. 581, 607), could climb, balance, stoop, kneel, crouch, and crawl with little trouble (Tr. 582, 608), and had no manipulative, visual, or communicative limitations (Tr. 583–84, 609–10). One of the doctors observed that Mr. Hixson did not anticipate surgery in the near term (Tr. 608). She also remarked that Mr. Hixson was able to do various chores and social activities (*id.*).

Mr. Hixson visited the emergency room and a pain management clinic numerous times after his period of disability ended, seeking more medication and

4

complaining of various ailments such as abdominal pain, gout, lung congestion, and nervousness (Tr. 633–34, 700–08, 720–25, 747–807, 810–71). Mr. Hixson frequently sought out medication beyond what his doctors prescribed (Tr. 700–08, 720–25, 747–807). During one visit, hospital personnel asked Mr. Hixson's pharmacy to call the police after Mr. Hixson attempted to add a new drug to his prescription list (Tr. 748). On another occasion, Mr. Hixson went to the emergency room three days in a row because his hand was swollen from a bug bite and he wanted medication for his nerves (Tr. 758, 770–71). The hospital gave him some medication, but Mr. Hixson wanted more than they would give and he left angry (Tr. 758). Mr. Hixson's pain management clinic also suspected that Mr. Hixson had misused his medication (Tr. 829).

Mr. Hixson also continued visiting the mental health clinic after his period of disability ended (Tr. 484–91, 614–639). He reported sleeping better and noted that his dreams were less frequent and less terrifying (Tr. 489–91). Mr. Hixson denied misusing medication and admitted that the medication was providing him with "some relief," despite continued feelings of depression and anxiety (Tr. 489, 490, 621). During one appointment, Mr. Hixson told Ms. Jacobs that he drove his mother to Florida for a funeral (Tr. 485). Mr. Hixson claimed difficulty in reading due to concentration problems (Tr. 638), but admitted that he played solitaire on the computer (Tr. 631). He reported increased anxiety regarding whether he would get disability benefits and move away from his parents (Tr. 618, 624). Notably, Mr. Hixson missed three appointments in November 2003 (Tr. 486–88) and nine appointments from February through October 2004 (Tr. 615, 616, 622, 623, 625, 628, 629, 632, 635). The record indicates that Mr. Hixson last visited the clinic on October 6, 2004 (Tr. 617), missed two more sessions after that (Tr. 615, 616), and did not visit the clinic again.

In October 2004, Ms. Jacobs, Mr. Hixson's therapist, filled out a work capacity assessment, opining that Mr. Hixson had a "poor" ability to make occupational adjustments, including maintaining attention and concentration, following work rules, and dealing with the public (Tr. 654). She maintained that Mr. Hixson could not handle complex job instructions and had a very limited ability to carry out simple job instructions (Tr. 655). Ms. Jacobs believed that Mr. Hixson had a "poor" ability to behave in an emotionally stable manner (*id.*).

Mr. Hixson visited Dr. Aasheim three more times after his period of disability ended (Tr. 255). Dr. Aasheim noted that Mr. Hixson was "planning for his 3rd lumbar disk procedure" during one of his last visits (*id.*). The record does not indicate that Mr. Hixson had the third surgery and contains no other treatment notes from Dr. Aasheim after January 2004 (Tr. 743–44). Dr. Aasheim filled out a physical capacity assessment in October 2004, approximately nine months after last seeing him (Tr. 746). He opined that Mr. Hixson was not capable of performing the full range of sedentary work demands or a full eight-hour work day (Tr. 746). Dr. Aasheim concluded that Mr. Hixson should not lift "at all," yet one paragraph later found him capable of lifting up to five pounds (*id.*). He concluded that Mr. Hixson could not

5

work at all due to back pain and "failed orthopedic surgery" (*id.*). Dr. Aasheim did not further explain his opinion (*id.*).

An MRI administered in November 2004 showed possible degenerative disc disease but no significant central spinal stenosis, recurrent disc protrusion, or significant facet arthropathy (Tr. 810).

In November 2004, Mr. Hixson requested that Dr. Barbara Overbay, M.D., a staff physician at the pain management clinic, write a letter summarizing his medical history for his disability claim (Tr. 823). Dr. Overbay noted that she had not been trained to make specific recommendations but would fill out a form provided to her as best she could (Tr. 808, 820). She opined that Mr. Hixson was not capable of performing sedentary work (Tr. 808). She noted that the prescribed physical limitations were based on his subjective pain complaints and stated that Mr. Hixson had been examined by a neurosurgeon in the past who would have a more informed opinion (*id.*). Dr. Overbay further conceded that she was only covering the clinic temporarily, had only examined Mr. Hixson once, which did not include a disability assessment, and was basing her opinion mostly from his medical records (Tr. 820, 808, 809).

The record does not include medical evidence from November 2004 until January 2007, when a medical clinic diagnosed Mr. Hixson with non-Hodgkins lymphoma (Tr. 906). Mr. Hixson was then referred to a cancer center (*id.*). He died in February 2007 (Tr. 897).

[Doc. 12, pgs. 3-9].

In the first hearing decision, the ALJ found that the decedent was precluded from performing substantial gainful activity from February 21, 2001, until September 30, 2003. (Tr. 54). However, based upon Dr. McConnell's physical assessment (Tr. 52), to which the ALJ assigned "great weight," the ALJ found that Mr. Hixson, beginning October 1, 2003, had the residual functional capacity ["RFC"] "to perform light physical exertion, due to improvement in his condition, which was reflected in the documentary evidence." (Tr. 55). He found that the decedent's "ability to perform all or substantially all of the requirements of light work is impeded by additional exertional and/or non-exertional limitations." (Tr. 56). In this portion of the hearing decision he did not specifically state what these diminishing "limitations" were, although earlier he mentioned the plaintiff's "anxiety/depression," which

6

the ALJ found caused him to have "mild restriction in activities of daily living, mild difficulties in maintaining social functioning, *moderate* difficulties in maintaining concentration/persistence/pace, and no episodes of decompensation of extended duration." (Tr. 54). While reciting the record evidence on the decedent's mental problems, the ALJ discussed Dr. Burnette's opinions, which were that Mr. Hixson had mild limitations in the ability to understand and remember and to tolerate/adapt to stress; no limitations in his ability to socially interact, and that Burnette did not "uncover" any problems with sustaining concentration and persisence.

At the hearing on November 24, 2004, which preceded the first administrative hearing, the ALJ utilized Donna Bardsley, a vocational expert. He asked her to assume that Mr. Hixson had the RFC for light and sedentary work, and had mental restrictions "consistent with Exhibit 15F," Dr. Burnette's assessment. She identified 11,000 light regional jobs and 13 million light national jobs, and 3,000 sedentary regional jobs and 2.5 million sedentary jobs in the national economy. (Tr. 923-24). Based upon Ms. Bardsley's response to the hypothetical, he found that the decedent was not disabled after October 1, 2003. (Tr. 57-58).

As stated above, the Appeals Council entered an order of remand. They stated that while the ALJ found that the decedent's disability ceased on September 30, 2003, "the record does not clearly establish that medical improvement related to the claimant's ability to work has occurred." (Tr. 883). The order then states that while Dr. McConnell's report indicated the plaintiff could perform a range of medium work, and was "a basis," (in fact, the primary basis) for the finding that the disability had ceased, "other evidence in the record suggests that his physical impairments may be worse than indicated in the hearing decision." (Tr. 883-

7

84). The order then notes that Dr. Aasheim opined the decedent could not even perform sedentary work, "although the record as it stands lacks sufficient clinical and examination findings to support the opinion..." It chides the ALJ for not "recontacting" Dr. Aasheim for "further clarification." It then talks about the treatment decedent received in 2003 and 2004 at the VA for physical and mental problems, and notes that "the residual functional capacity assessment pertaining to the unfavorable portion of the decision does not include specific mental limitations."[1] Because of all of this, "the Appeals Council concludes that additional development and further evaluation are needed to determine whether medical improvement related to the claimant's ability to work has occurred." (Tr. 884).

The Appeals Council then instructed the ALJ to do various things. He was to clear up an issue regarding the denial of an earlier application for benefits and whether that determination should be reopened. He was "obtain additional evidence" to "complete the administrative record," including "all existing treating source evidence," and "may include" consultative physical and mental examinations regarding "what the claimant can still do despite the impairments." He was ordered to "further evaluate the claimant's mental impairments in accordance" with the regulations. He was to "give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support" of those limitations. Also, "if warranted by the expanded record," he was to obtain supplemental evidence from a

---

[1] The assessment of Burnette, and the use of his assessment in the question to Ms. Bardsley were also in the record before the Appeals Council, but not mentioned in the order of remand.

8

vocational expert to clarify the effect of the assessed limitations on what jobs the plaintiff could perform. Finally, he was to "evaluate the issue of disability cessation in accordance with the requirements of 20 CFR 404.1594 and 416.994." (Tr. 884-85).

Less than two months later, Mr. Hixson died before further examinations, consultative or otherwise, could be obtained.

On May 21, 2007, the ALJ conducted a second administrative hearing. He took testimony from the decedent's mother. A vocational expert was present, but the ALJ elected to ask him no questions. (Tr. 927-42).

The hearing decision which is the subject of this review was rendered on June 8, 2007. The ALJ defined the issue to be addressed as the period between October 1, 2003 through decedent's passing on February 9, 2007. He then proceeded to the five step analysis utilized in determining whether someone is disabled in the first instance. He noted that the decedent had not engaged in substantial gainful activity during that period, but noted that he had worked on a part-time basis as a scorekeeper for Little League baseball games. (Tr. 19).

The ALJ then summarized the extensive medical record of well over 800 pages recounting treatment for his back problems, the traumatic aftereffects of his 2002 car wreck which was the apparent reason for the closed period of disability, and his mental problems. This is noted to have been virtually a cut and paste of the 2005 hearing decision which prompted the Appeals Council's order of remand. He did expand slightly on his critique of Dr. Aasheim, the treating orthopedic surgeon's opinion, stating that Dr. Aasheim encroached on the Commissioner's prerogative by using the word "disabled" in his treatment notes and assessments. (Tr. 22). In a paragraph identical to that used in 2005, the ALJ said that he

9

"rejects (Dr. Aasheim's) assessment as inconsistent with Dr. Aasheim's own narrative reports, the claimant's actual functioning, and the remaining documentary evidence of record." (Tr. 26).

The ALJ also rejected Dr. Overbay's assessment (Tr. 808-09) from the VA, primarily because she based her assigned physical limitations on subjective complaints. (Tr. 22). Dr. Overbay also stated, however, that "he (plaintiff) has been seen by a neurosurgeon (Dr. Aasheim) in the past who would have had a better opinion on this." (Tr. 808). He also gave no weight to the opinion of decedent's therapist, Wylene Jacobs, because her assessment was "too restrictive and inconsistent with the objective findings of record as well as the remaining documentary evidence of record." (Tr. 26).

The ALJ gave great weight to Dr. McConnell, Dr. Burnette, and the State Agency non-examining physician and psychologist. (Tr. 28).

He found that the decedent had the RFC to "perform light work, with an emotional impairment imposing restrictions in the ability to perform work-related activities as cited in Exhibit 15F (Dr. Burnette)." (Tr. 28). He relied upon the numbers of jobs identified by Ms. Bardsley, the vocational expert at the 2005 hearing, to find that the decedent was not disabled. (Tr. 30).

Plaintiffs' counsel asserts that the ALJ did not follow the Appeals Council's remand order in any significant respect and that this is both an error of law and an abuse of discretion. In particular, they state that the ALJ did not consider the issue of medical cessation as specifically required in the remand order and as set out in 20 CFR § 404.1594 and 20 CFR § 416.994. These regulations have the same requirements, but one applies to

disability insurance benefits and the other to supplemental security income. Also, they argue that he did not further evaluate the mental impairment in compliance with the order, pointing out that the ALJ did not even ask a different hypothetical of the available VE at the second hearing, but declined to ask him anything and relied entirely on Ms. Bardsley's testimony from the first hearing. Even if the ALJ could be said to have followed the mandates of the Appeals Council, his conclusions lacked substantial evidence because he did not give any weight to Dr. Aasheim or any other treating source.

Initially, one might state that the Appeals Council, whose order on the first decision led to the second decision, must have felt that the second decision passed muster since it was approved without any elaboration. It is true that the Social Security Administration should rectify its own flawed adjudications. However, if the Appeals Council was "correct" the first time, any failure to correctly apply the law and regulations the second go around does not diminish the logic of the remand order, or validate any error the ALJ may have perpetuated in the second hearing decision.

The regulations cited above relative to whether disability continues or ends begins with the fundamental requirement that "we *must* determine if there has been any medical improvement in your impairment(s) *and*, if so, whether this medical improvement is related to your ability to work." *Id.*, (a). In other words, to be stripped of benefits after having been found disabled, the Commissioner must find that there has been medical improvement in your severe impairments and that this improvement increased your residual functional capacity to the point that you can now engage in substantial gainful activity. Paragraph (f) of these regulations sets out the evaluation steps, which are similar but materially different

11

from the familiar five step procedure regarding an initial finding of disability or not. As with the five step procedure, the Commissioner may stop at any point in which the claimant is found to be not disabled.

The first two steps, whether the claimant is working and whether the claimant meets a listed impairment, are the same. However, one must bear in mind that the person being evaluated has already been determined to have a severe impairment or impairments which precludes substantial gainful activity. Therefore, the next step, (f)(3), requires the adjudicator to determine if there has been medical improvement regarding the impairment(s). If not, then the disability remains, absent some exceptions which have no application to this case. If there has been medical improvement, (f)(4) says "we must determine whether it is related to your ability to do work...i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination." Once again, absent non-applicable exceptions, a finding that the ability to work has not increased because of the medical improvement is tantamount to a finding of continuing disability.

The next applicable step, (f)(6), states that if you have had medical improvement which is related to your ability to do work, the Commissioner will determine if your combination of impairments are severe. At (f)(7), if the impairments are still severe, the Commissioner will determine if you can return to your past relevant work. If not, (f)(8) deals with whether there are other jobs which you can perform.

Under these steps, an individual can have medical improvement, but it must also be shown that the improvement renders the person able to work. For example, a person may be

12

in a full body cast for months following an accident. After removal of the cast, the fact that they can then stand and walk and feed themselves is medical improvement, but that improvement almost certainly doesn't have an impact on the ability to engage in substantial gainful activity. However, if the person then has the RFC to engage in substantial gainful activity, then they both requirements are met and they are no longer disabled.

The ALJ did not mention 20 CFR §404.1594 or 416.994 in his decision. No mention of this sequential evaluation process was made regarding medical improvement. However, not to put form over substance, did he in fact find and document medical improvement which was related to decedent's ability to work?

Arguably, he did, at least in the physical aspect. The medical records from the decedent's treating physicians showed that he regained the ability to ambulate in some fashion, although he utilized a cane. There was, of course, sharp disagreement between Dr. Aasheim and Dr. McConnell over what the decedent could do. Dr. McConnell's assessment indicated that the plaintiff could perform a full range of light work, from a physical standpoint. Theoretically, these findings together would show medical improvement related to decedent's ability to work, although none of the "magic words" were used. However, this *exact same evidence*, and the ALJ's comments upon it, did not satisfy the Appeals Council the first time around.

Even if the regulatory scheme was satisfied regarding the plaintiff's physical improvement, there are other severe problems with this adjudication. In both decisions, the ALJ rejected Dr. Aasheim's "assessment as being inconsistent with Dr. Aasheim's own reports, the claimant's actual functioning, and the remaining documentary evidence of

13

record." (Tr. 26 and 53). Perhaps the ALJ is fixating on Dr. Aasheim's and Dr. Huddleston's note at the time of the surgery in February of 2002 that "Mr. Hixson cannot work for a total of 14 months due to his injuries." (Tr. 425). Such a prediction is not substantial evidence that the patient was able to go back to work in fourteen months, merely a hopeful projection. Indeed, Dr. Aasheim's note of the visit on November 24, 2003, nearly two months after the date the ALJ later determined that the decedent's disability ended, indicates "muscle spasm evident in the left leg with positive straight leg raising test strongly positive." (Tr. 255). A muscle spasm, observed by a patient's treating orthopedic surgeon and not merely reported as a subjective complaint, is a painful condition which cannot be faked. How could the ALJ conclude that such observations in Dr. Aasheim's notes rendered his opinion totally unworthy of belief?

It is true that Dr. McConnell opined that the decedent could perform light work. But he also noted positive straight leg raising and a decreased range of motion. The preference for the opinion of a treating physician can often be overcome by a thorough exam by a consultative physician. This is particularly true when the asserted condition is highly subjective and when the treating doctor's notes are weakly detailed and unbelievable. However, where as here, the treating physician's notes are well detailed, related to recovery from serious injuries and surgery, and ring of believability, a mere cursory one time exam by a consultant joined by a chorus of non-examining State Agency evaluators does not overcome the bias for the opinion of the treating doctor.

The Commissioner also attacks Dr. Aasheim's assessment because he opined that the plaintiff was not capable of working while the plaintiff was "actually working at that time."

14

[Doc. 12, pg. 15]. However, the "work" alluded to was acting as a paid scorekeeper in Little League Baseball on a game by game basis, something he had been doing for many years before his first conditions manifested themselves. (Tr. 912-14) Occasionally recording balls and strikes, hits, runs and errors is a pitifully poor point of reference to show a person could perform the light work of an assembler or cleaner, the jobs identified by the VE.

There is one final error, repeated in both hearing decisions, which infected the opinion of the vocational expert at the first hearing, the only time one was actually questioned. In both decisions, the ALJ stated that he found that decedent "experienced mild restriction in activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration/persistence/pace, but no episodes of decompensation of extended duration." (Tr. 27 and 54). The question to the VE incorporated the opinion of Dr. Burnette, who "uncovered" no "significant deficits" in concentration, persistence or pace. "Moderate" does not equate with "none." "None" was the foundation of the VE's answer. While the ALJ stated in his second decision that the decedent had the residual functional capacity for light work with the mental limitations found by Dr. Burnette, that was not the degree of severity found earlier in the same decision. It was clearly reversible error for the ALJ not to include the moderate limitations in his question to the VE.

The Court is of the opinion that the ALJ's decision that the decedent's disability ceased on October 1, 2003, is not supported by substantial evidence in that proper weight was not given to the treating physician's opinion under the facts of this case, and because he made inconsistent findings regarding the level of severity of the decedent's mental impairment which tainted the question to the VE. In the opinion of the Court, the Appeals Council was

15

*right the first time*, and the second hearing decision failed to rectify any of its concerns in any meaningful matter. Mr. Hixson is deceased. A second remand could not shed further light on the decendent's condition after Dr. Aasheim's note of November 24, 2003.

Mr. Hixson lived approximately 40 months after the date the ALJ determined his disability ceased. It is respectfully recommended that his surviving representatives be awarded those benefits. It is recommended that the plaintiffs' Motion for Judgment on the Pleadings [Doc. 9] be GRANTED, and the defendant's Motion for Summary Judgment [Doc. 11] be DENIED.[2]

Respectfully submitted:

s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

16